1
2
3
4
5
6
7
8

9                    UNITED STATES DISTRICT COURT

10                   EASTERN DISTRICT OF CALIFORNIA

11

12  In Re:

13  SK Foods, L.P., a California limited
    partnership, et al.,
14

15  LARRY J. LICHTENEGGER AND              No.  14-cv-00402-TLN
    GERARD A. ROSE,
16
                    APPELLANTS,
17                                         **ORDER AFFIRMING SUMMARY**
        v.                                 **JUDGMENT ON ORDER TO SHOW**
18                                         **CAUSE FOR CONTEMPT**

19  BANK OF MONSTREAL, as
    Administrative Agent, successor by
20  Assignment to Debtors SK Foods, L.P. and
    RHM Industrial Specialty Foods, Inc., a
21  California corporation, dba Colusa County
    Canning Co.,
22
                    Appellee.
23

24       This matter is before the Court pursuant to Appellant Larry J. Lichtenegger's and

25  Appellant Gerard A. Rose's (separately "Lichtenegger" and "Rose," together "Appellants")

26  appeal of an order for summary judgment issued by the United States Bankruptcy Court for the

27  Eastern District of California finding Appellants in contempt for violation of a temporary

28  restraining order and preliminary injunction.  (*See* Notice of Bankruptcy Appeal, ECF No. 1.)

                                        1

Appellants (ECF Nos. 5-6) and Appellee Bank of Montreal ("Appellee") (ECF No. 15) filed opening briefs, and Appellants have filed replies (ECF Nos. 17–18).  This Court has reviewed and considered the arguments raised by both parties.  For the reasons set forth below, the Court hereby AFFIRMS the bankruptcy court's order.

## I.      FACTUAL BACKGROUND

SK Foods, LP ("SK Foods") was in the business of processing and readying the shipment of tomatoes and other crops.  The processed tomatoes were loaded by SK Foods into 55-gallon fiber drums, which it also manufactured.  SK Foods had fixtures, furniture, equipment, inventory, and other tangible and intangible assets which it used to manufacture the drums, collectively referred to as the "Drum Line".  (ECF No. 8-1 at 2–3.)  Shortly before SK Foods filed for Chapter 11 bankruptcy in May, 2009, the Drum Line was disassembled and moved from SK Foods' premises to the premises of CSSS, LP, dba "Central Valley Shippers" ("CVS").  Both SK Foods and CVS were controlled by Scott Salyer ("Salyer").  (ECF No. 8-2 at 2.)

The Trustee of SK Foods' bankruptcy estate (the "Trustee") feared that Salyer was attempting to move the Drum Line beyond the jurisdiction of the bankruptcy court.  (ECF No. 8-1 at 4.)  On August 21, 2009, to prevent the bankruptcy estate from losing the Drum Line, the Trustee filed a complaint seeking recovery of the Drum Line and a temporary restraining order preventing CVS from disposing of the Drum Line, while also requiring CVS to provide a corporate designee with information on the whereabouts of the Drum Line.  (ECF No. 8-1 at 7.)  On August 21, 2009, apparently presuming that Rose was counsel for CVS, the Trustee also informed Rose, that an *ex parte* temporary restraining order ("TRO") hearing had been scheduled for three days later, August 24, 2009.  (ECF No. 5 at 5.)  Rose was unable to attend the hearing and arranged for Lichtenegger to appear instead.  (ECF No. 5 at 7.)

On August 24, 2009, Lichtenegger failed to appear at the hearing, and the TRO was issued.  (*See* TRO, ECF No. 8-4 at 12.)  The TRO required that CVS and its "agents, servants, employees and attorneys and those in active concert or participation with [CVS] or them" refrain from (1) selling, transferring, encumbering, or moving the Drum Line out of California, and (2) produce a witness for deposition with knowledge of the "current location, storage and condition"

2

of the Drum Line within 5 days of entry of the TRO.  (ECF No. 8-4 at 13.)  Despite the TRO, the

Drum Line was shipped from California to New Zealand seven days later on August 31, 2009.

(*See* Motion for Contempt, ECF No. 8-5 at 21).  On September 3, 2009, an additional hearing was

held, and a preliminary injunction issued the following day, setting forth essentially the same

requirements as stated in the original TRO, including that persons (which the bankruptcy court

determined to include Appellants) refrain from moving the Drum Line out of California, and that

a corporate designee be produced no later than September 11, 2009, for deposition regarding the

Drum Line's whereabouts.  (ECF No. 8-16 at 51.)

## II.   PROCEDURAL BACKGROUND

In February of 2010, the Trustee filed a motion for an order to show cause why the

Appellants should not be held in contempt for violation of the TRO.  (ECF No. 8-5 at 1.)  In

September of 2013, Appellee filed a motion for summary judgment on the issue of contempt.

(*See* Points and Authorities in Support of Summary Judgment, ECF No. 8-11 at 1.)   The motion

for summary judgment was granted in December of 2013 (*see* Order Granting Summary

Judgment, ECF No. 9-14 at 1), and judgment against Appellants was entered in January of 2014

(*see* Judgment Against Appellants, ECF No. 9-15 at 1-2).  In January of 2014, Appellants filed

the instant appeal of the motion for summary judgment. (*See* Notice of Appeal, ECF No. 9-16 at

1.)  The parties filed opening briefs and Appellants filed reply briefs.  (*See* ECF Nos. 5, 6, 15, 17,

18.)

## III.   STANDARD OF LAW

Civil contempt is "a party's disobedience to a specific and definite court order by failure

to take all reasonable steps within the party's power to comply.  The contempt need not be

willful."  *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (internal

quotations omitted).  The moving party must prove contempt by clear and convincing evidence.

*Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998), as amended on denial of

reh'g and reh'g en banc (June 15, 1998).

As stated above, Appellee successfully moved for summary judgment on the contempt

motion in the bankruptcy court.  This Court reviews de novo the grant of summary judgment by

1   the bankruptcy court.  *See In Re Two S. Corp.*, 875 F.2d 240, 242 (9th Cir. 1989) ("[The Ninth

2   Circuit] reviews decisions of the Bankruptcy Appellate Panel de novo [citations]; both the BAP

3   and [the Ninth Circuit] review the Bankruptcy Court's decision to grant summary judgment de

4   novo. [citations.]  The standard for granting summary judgment in an adversarial bankruptcy

5   proceeding is the same as under [Federal Rule of Civil Procedure] 56(c).")

6       The Court notes that in certain circumstances the reviewing court must "examine the

7   bankruptcy court's determinations of law de novo and its findings of fact for clear error."  *In re*

8   *Smith*, 582 F.3d 767, 777 (7th Cir. 2009); *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 526 (9th Cir.

9   2001) (on review of cross motions for summary judgment in a bankruptcy proceeding, the Ninth

10  Circuit stated it was "reviewing the bankruptcy court's legal conclusions de novo and its factual

11  determinations for clear error").  *See also F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th

12  Cir. 1999) ("We review a district court's civil contempt order for an abuse of discretion.

13  [citations.]  We review the district court's findings of fact in connection with the civil contempt

14  adjudication for clear error.")

15      The bankruptcy court made both credibility determinations and clear factual findings.  For

16  instance, as explained below, it is disputed whether Appellants talked about the Drum Line on the

17  telephone while Rose was on vacation.  However the bankruptcy court found – given the sheer

18  weight of the evidence – that it simply did not believe Appellants on this point.  Credibility

19  determinations were also no doubt shaped by the bankruptcy court's firsthand interaction with

20  Appellants throughout the adversarial proceeding, as shown by the court's references to

21  Appellants' presence at multiple court hearings.  In short, the bankruptcy court engaged in fairly

22  thorough fact-finding.  However, the express legal standard stated in its order — which was

23  prompted by the summary judgment motion filed by Appellee — was the standard for Rule 56

24  summary judgment.   Therefore, this Court conducts a de novo review of the bankruptcy court's

25  grant of summary judgment in favor of Appellee.

26      Summary judgment is appropriate when the moving party demonstrates that no genuine

27  issue as to any material fact exists, and therefore, the moving party is entitled to judgment as a

28  matter of law.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

1   Under summary judgment practice, the moving party always bears the initial responsibility of

2   informing the district court of the basis of its motion, and identifying those portions of "the

3   pleadings, depositions, answers to interrogatories, and admissions on file together with the

4   affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

5   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

6   burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

7   in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on

8   file." *Id.* at 324 (internal quotations omitted).  Indeed, summary judgment should be entered

9   against a party who does not make a showing sufficient to establish the existence of an element

10  essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at

11  322.

12        If the moving party meets its initial responsibility, the burden then shifts to the opposing

13  party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec.*

14  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585−87 (1986); *First Nat'l Bank v. Cities Serv.*

15  *Co.*, 391 U.S. 253, 288−289 (1968).  In attempting to establish the existence of this factual

16  dispute, the opposing party may not rely upon the denials of its pleadings, but is required to

17  tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

18  support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must

19  demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

20  suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that

21  the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for

22  the nonmoving party. *Id.* at 251−52.

23        In the endeavor to establish the existence of a factual dispute, the opposing party need not

24  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

25  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

26  trial." *First Nat'l Bank*, 391 U.S. at 288−89.  Thus, the "purpose of summary judgment is to

27  'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

28  trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963

1  amendments).

2       In resolving the summary judgment motion, the court examines the pleadings, depositions,

3  answers to interrogatories, and admissions on file, together with any applicable affidavits.  Fed.

4  R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305−06 (9th Cir. 1982).  The evidence

5  of the opposing party is to be believed, and all reasonable inferences that may be drawn from the

6  facts placed before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S. at

7  255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

8  obligation to produce a factual predicate from which the inference may be drawn.  *Richards v.*

9  *Nielsen Freight Lines*, 602 F. Supp. 1224, 1244−45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th

10  Cir. 1987).

11       Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party

12  "must do more than simply show that there is some metaphysical doubt as to the material facts."

13  *Matsushita*, 475 U.S. at 586.  "Where the record taken as a whole could not lead a rational trier of

14  fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* at 587.

15      **IV.**   **ANALYSIS**

16       The primary issues on appeal of the bankruptcy court's order are whether Appellants were

17  bound by the TRO, and whether they violated two separate provisions requiring the parties to: (1)

18  refrain from selling, transferring, encumbering, or moving the Drum Line out of California; and

19  (2) produce a corporate designee for deposition with knowledge of the "current location, storage

20  and condition" of the Drum Line.  (ECF No. 8-4 at 13; *see also* Preliminary Injunction, ECF No.

21  8-16 at 51.)

22       Appellants raise numerous arguments, which are addressed to varying degrees throughout

23  the course of this Order.  Rose specifically argues as follows: (1) he is not responsible for the

24  actions of CVS as a trustee or officer; (2) he was not counsel for CVS until August 31, 2009;

25  (3) he cannot be "faulted" for not appearing at the TRO hearing; (4) he did not have sufficient

26  notice of the TRO; (5) he did not have actual notice of the TRO; (6) he did not claim to be

27  unreachable while on vacation; (7) he did not know of, or facilitate, the Drum Line shipment;

28  (8) he did not know the Drum Line was retrievable at any point; (9) he could not have stopped the

1    Drum Line from being shipped; (10) he did not violate the order to produce a witness; (11) he did

2    not conceal Salyer's involvement with the shipment of the Drum Line; (12) he did not violate the

3    October 8th order because he was no longer counsel[1]; and, (13) he requested an evidentiary

4    hearing.  Rose also argues that the damage award was contrary to law and that the bankruptcy

5    court made numerous errors in its factual determinations.  (ECF No. 5 at 13–14, 17–24, 26; ECF

6    No. 17 at 7, 9, 11–12.)

7           Lichtenegger argues as follows: (1) he is not included within the group of those enjoined

8    by the TRO; (2) he was not an attorney for CVS as a result of his failed appearance at the TRO

9    hearing; (3) he withdrew as an attorney for CVS; (4) he did not make a misrepresentation

10   regarding the shipment of the Drum Line; (5) he took reasonable steps to comply with the TRO

11   by advising Salyer about the consequences of violating the TRO; (6) he could not have done

12   anything to comply with the TRO; (7) he was not bound to produce a witness because he was not

13   enjoined by the TRO; and (8) he could not have produced Salyer as a witness.  Lichtenegger also

14   argues that: (9) the TRO was a prohibitory injunction that did not require action; (10) the TRO

15   was issued improperly; (11) the damages were too high; and (12) the bankruptcy court made

16   inappropriate findings of fact.  (ECF No. 6 at 9–11, 16, 18, 20–22; ECF No. 18 at 5, 9, 14, 16.)

17                         **A.    Appellants Evidence**

18          Appellants both submitted affidavits in opposition to the summary judgment motion.  (*See*

19   Declaration of Rose, ECF No. 9-4 at 1; Declaration of Lichtenegger, ECF No. 9-8 at 1.)  Appellee

20   argues that Appellants rely heavily on said affidavits.  (ECF No. 15 at 6.)  In finding that there

21   was clear and convincing evidence of Appellants contemptuous activity, the bankruptcy court

22   found that "the only evidence [Appellants] have offered to show why they did not comply [with

23   the injunctions] is their own self-serving testimony, most of which the court does not believe."

24   (*See* Tentative Ruling Granting the Trustee's Summary Judgment Motion, ECF No. 9-13 at 21.)

25          The Court has the discretion to discredit "self-serving" affidavits that lack detailed facts

26   and supporting evidence.  *U.S. v. Bright*, 596 F.3d 683 (9th Cir. 2010) (citing *FTC v. Publ'g*

27   _____

28   [1] At a hearing on October 8, 2009, the bankruptcy court admonished Appellants that sanctions would issue if a
     witness with knowledge of the Drum Line were not produced.  (*See* ECF No.15 at 17.)

1    *Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.1997)).  These "self-serving" affidavits, along

2    with conclusory statements in appellate briefs, are insufficient to create a genuine issue of

3    material fact.  *Id.* at 1171 (citing *Mitchel v. General Electric Co.*, 689 F.2d 877, 877–79 (9th Cir.

4    1982).

5         Both Rose's opening brief and reply brief cite almost exclusively to his affidavit in

6    opposition to the motion for summary judgment.  (Compare Rose's Briefs, ECF No. 5, 17, with

7    Rose's Declaration, ECF No. 9-4.)  There are inconsistencies between Rose's affidavit and other

8    undisputed evidence.  For example, Rose states in his brief (citing to his affidavit) that he had no

9    meaningful contact with his colleagues while on vacation, but there are records of frequent calls

10   to Lichtenegger made during that time period.  (ECF No. 5 at 23–24; ECF No. 8-15 at 33–34.)

11   Rose states in the affidavit that he had no knowledge that Salyer was the driving force behind the

12   shipment until Rick Emmett's deposition in November.  (ECF No. 9-4 at 14; ECF No. 5 at 22.)

13   However, as discussed below, given Rose's relationship with Salyer as well as email

14   communications involving both Rose and Salyer regarding the Drum Line and the TRO hearing

15   on August 24, 2009, it is not creditable for Rose to state in an affidavit that he lacked knowledge

16   that Salyer was involved with the movement of the Drum Line.

17        Lichtenegger's brief also includes conclusory statements regarding facts and citations to

18   his own affidavit.  (ECF No. 6 at 14, 16.)  Similar to Rose, Lichtenegger claimed in his affidavit

19   that he could not reach Rose while Rose was on vacation, but call records refute this.  (ECF No.

20   8-15 at 28–35.)  The bankruptcy court also noted that Lichtnegger filed a sworn affidavit in

21   opposition to entry of the preliminary injunction on September 3, 2009, repeating information that

22   he knew by then to be false — specifically, that the Drum Line had "already shipped" prior to the

23   TRO hearing on August 24, 2009.  (ECF No. 9-13 at 7.)  Thus, on review of the moving papers,

24   the submitted record, and the arguments in full, the Court finds that Appellants have not presented

25   an issue of triable fact.  As the bankruptcy court found, Appellants' evidence consists of

26   conclusory statements or self-serving affidavits, with no additional supporting evidence.

27        Appellants also raise the issue that they were not afforded an evidentiary hearing prior to

28   the bankruptcy court's grant of summary judgment.  (ECF No. 5 at 3.)  Appellants requested an

1    evidentiary hearing in their "Response to Motion for Order to Show Cause Re Contempt," filed

2    on April 6, 2010 in the bankruptcy court.  (ECF No. 8-6.)  After reviewing the record, it does not

3    appear that Appellants requested an evidentiary hearing specifically in conjunction with

4    Appellee's motion for summary judgment, which was filed on August 15, 2013.  The Court is not

5    aware of Appellants' raising the issue again until the hearing on December 18, 2013, following

6    the bankruptcy court's tentative written order finding that Appellants were in contempt.  The

7    request for an evidentiary hearing was briefly raised at that time.  (ECF No. 9-19 at 21.)  In fact,

8    in the tentative ruling itself, the bankruptcy court stated no parties had requested an evidentiary

9    hearing.  (ECF No. 9-13 at 2.)

10        This Court's overriding concern is what evidence would actually be presented at an

11   evidentiary hearing.  In their briefing before this Court, Appellants do not explain how an

12   evidentiary hearing would prove favorable to their position, considering that the primary support

13   for Appellants' position is their own statements – which were before the bankruptcy court and are

14   now before this Court.  For instance, Appellant Rose's Reply Brief directs the Court to the

15   request for a hearing made in April, 2010 – which was raised again briefly at the hearing in

16   December, 2013 – but offers no elaboration on what an evidentiary hearing would accomplish.

17   (ECF No. 17 at 11–12.)

18        It is within the bankruptcy court's discretion to determine that no evidentiary hearing is

19   required because no material factual dispute exists.  *See* Local Rule 9014-1(g)(4)(A).  It appears

20   that the bankruptcy court made that determination, and without more, this Court does not find

21   adequate reason to disturb that decision.

22                    **B.    Attorneys for CVS**

23        The person or entity on whose behalf a lawyer acts becomes the lawyer's client.  *See*

24   *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).  The majority rule is that

25   formation of an attorney-client relationship is not confined only to an express or implied

26   agreement.  *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1317 (7th Cir. 1978)

27   *cert. denied*, 439 U.S. 955 (1978).  Therefore, an attorney-client relationship may form without an

28   express or implied agreement by a lawyer acting on behalf of a client.  *See also* Restatement

                                             9

(Third) of Law Governing Law § 14 (2000) (providing that an attorney-client relationship arises when the client manifests an intent, to the attorney, that the attorney provide legal services, and the attorney manifests consent to that party to perform the work).

Appellants argue that neither was counsel for CVS at the time the Drum Line was being shipped out of the country in violation of the TRO.  (ECF No. 5 at 17; ECF No. 6 at 10.) However, on review of the record, the Court finds that both Lichtenegger and Rose were acting as counsel for CVS during the relevant time period beginning August 21, 2009.

### 1.     Rose as Attorney

Rose specifically argues that he never agreed to be counsel for CVS prior to August 31, 2009 (ECF No. 5 at 17), and that his prior appearance for CVS in the underlying bankruptcy case does not make him counsel for the Drum Line action.  (ECF No. 17 at 8.)  However, the overwhelming evidence regarding the Drum Line issue, and other issues, which is not credibly disputed by Rose, lead this Court to agree with the bankruptcy court that Rose was counsel for CVS prior to, and after, the August 24 TRO hearing.  Rose previously admitted that he was acting as counsel for CVS "on or before August 24, 2009", which was the date the TRO was entered. (*See* Response by Rose to Requests for Admission, ECF No. 8-16 at 11.)

According to Appellee, on August 21, 2009, the Trustee contacted Rose, whereupon Rose requested the moving papers for the TRO.  (*See* Rose Declaration, ECF No. 9-4 at 4–5.)  That very same day, August 21, 2009, Rose requested that Lichtenegger appear at the hearing on August 24, 2009, so that Rose could go on vacation.  (ECF No. 9-4 at 5.)  Further, Rose consulted with Salyer's attorneys and began preparing a response to the TRO when he returned from vacation on August 31, 2009.  (ECF No. 9-4 at 6.)  Aside from the instant action, Rose has variously represented the Salyer family and entities they own, including both SK Foods and CVS, for "many years."  (ECF No. 8-16 at 27.)

As explained by the bankruptcy court, in the contempt proceeding Appellee "submitted a copy of a Purchase and Sale Agreement dated December 1, 2008 (nine months before the Drum Line controversy arose), pursuant to which SK purported to sell the Drum Line to CVS.  [] The agreement was signed on behalf of CVS, as the buyer, by Rose and only Rose.  Rose signed the

agreement as trustee of the trusts of which Salyer's daughters were the beneficiaries, the same capacity he occupied on August 21, 2009 and thereafter, until he purported to resign as such in October of 2009." (ECF No. 9-13 at 15–16.) This Court notes that Rose provides no specific response to the fact that his signature was contained on the aforementioned Purchase and Sale Agreement.

The only evidence indicating Rose was not counsel for CVS before August 31, 2009, are Rose's statements to the effect that he had not agreed to represent CVS in the Drum Line controversy. (ECF No. 9-4 at 4; ECF No. 17 at 8.) In sum, the Court finds that Rose was acting as counsel for CVS during the relevant time period beginning August 21, 2009. Without more, the Court does not find there is a genuine issue of material fact regarding whether Rose was counsel for CVS during the relevant time periods.[2]

## 2.    Lichtenegger as Attorney

Lichtenegger argues that he was not an attorney for CVS because: (1) he was merely doing a favor for Rose by appearing at the TRO hearing; (2) he did not appear in any form outlined by Local Bankruptcy Rule 2017-1; and alternatively (3) he withdrew because the California State Bar Rules of Professional Conduct required him to withdraw from representation if he knew Salyer would violate the TRO. (ECF No. 18 at 4; ECF No. 6 at 10.)

Critical to this determination are the undisputed facts of Lichtenegger's involvement with the Drum Line on the dates immediately surrounding the TRO, when the Drum Line could have been prevented from being shipped to New Zealand. The bankruptcy court's findings in this regard are in accord with Appellee's statement of undisputed facts. (*See* Reply to Lichtenegger Undisputed Facts, ECF No. 9-11.) The bankruptcy court found that on the afternoon of August 21, 2009, the Trustee's counsel, Michael Carlson ("Carlson"), called Rose and told him he would be filing an application for the TRO; Carlson later sent the moving papers to Rose by email. Rose then forwarded the moving papers to Salyer and other counsel. Carlson also e-mailed the moving papers to Litchenegger later that afternoon. Because Rose was going to be on vacation the week

---

[2] Since this finding renders Rose bound by the TRO, the Court declines to address the arguments regarding whether Rose was an officer of CVS or liable for CVS' actions as trustee for the trusts that owned CVS. (ECF No. 5 at 14–16.)

1    of the TRO hearing, he requested that Litchtenegger appear for him at the hearing.  Later that

2    afternoon, Salyer sent an email to Rose, Lichtenegger, and other counsel including Malcom

3    Segal, asking them to "take the gloves off" regarding legal actions against the Trustee.

4    Lichtenegger responded to Salyer that he and Rose were "dealing with [the TRO issue] now."

5    (ECF No. 9-13 at 4–7; ECF No. 6 at 6–7.)  Lichtenegger also contacted Carlson via telephone and

6    left him a voicemail stating that he had "investigated and confirmed that the drums [sic] shipped

7    on Thursday – they are already gone.  That makes your application for a TRO moot."  However,

8    subsequent to contacting Carlson, Lichtenegger sent an email to Salyer asking "Confirm drums

9    shipped on Thursday?"  Subsequent to that email, Carlson then returned Lichtenegger's call, and

10   Lichtenegger told Carlson that it was his understanding that the Drum Line had shipped the

11   previous day.  (ECF No. 9-13 at 4–7; ECF No. 6 at 6–7.)

12        On August 23, the day before the TRO hearing, Salyer sent Lichtenegger an email stating

13   "Equipment does not ship out until Wednesday, earliest."  Salyer sent another email minutes later

14   stating "Departs Thursday."  Litchtenegger did not appear at the August 24th TRO hearing,

15   although he "called Carlson at 8:00 a.m. on the morning before the hearing to inform him that he

16   was not going [to] appear, but instead of reaching [Carlson], had to leave a voice mail message to

17   that effect."  (ECF No. 9-13 at 4–7; ECF No. 6 at 6–7.)

18        Though Lichtenegger disputes the meaning of many of these interactions, neither his

19   Opening nor Reply Brief filed on appeal in this Court appear to dispute that any of the

20   aforementioned communications occurred.  That all of these communications occurred

21   demonstrates that Lichtenegger was acting on behalf of CVS as counsel, at the behest of Salyer.

22   An additional supporting fact considered by the bankruptcy court – apparently not disputed by

23   Lichtenegger – was that in early August of 2009, Salyer had asked Lichtenegger to serve as his

24   counsel for other legal matters, including developing a new action against BMO regarding a

25   property at Lake Tahoe, to expunge a lis pendens the Trustee had filed against certain farming

26   properties, and to sign papers supporting a 12(b)(6) motion in the trustee's substantive

27   consolidation action.  (ECF No. 9-13 at 13.)  Likewise, Rose's phone records indicate that he

28   made several phone calls to Lichtenegger between August 21st and August 28th —the period

1  immediately before and after the TRO hearing.  (ECF No. 8-15 at 33–34; ECF No. 9-13 at 10–
2  11.)

3      The undisputed facts demonstrate: that Lichtenegger was part of Salyer's legal team
4  around the time the TRO was entered; that Lichtenegger, Rose, and Salyer engaged in several
5  meaningful communications around the time the TRO was entered for the purpose of dealing with
6  the Drum Line; and that Lichtenegger had acted on behalf of Salyer and CVS for the purpose of
7  dealing with the Drum Line's transfer.  Thus, the Court views Lichtenegger to have been bound
8  by the TRO by virtue of his status as counsel for CVS and Salyer.

9      Even if Lichtenegger were not counsel, the Court agrees with the bankruptcy court that his
10  actions establish that he was in "active concert or participation" with Salyer and Rose regarding
11  the TRO, which independently establishes his being bound by the TRO.  *See* FRCP 65(d)(2).
12  Therefore the bankruptcy court was proper in finding no genuine triable issue of material fact
13  regarding Lichtenegger being bound by the TRO by virtue either of his status as counsel or acting
14  in concert or participation with Rose and Salyer.

15      Lichtenegger argues that pursuant to LBR 2017-1(b)(1), "no attorney may participate in
16  any action unless the attorney has appeared as an attorney of record."  However, Lichtenegger
17  cites no authority for the proposition that an attorney may not be bound by a TRO unless he has
18  appeared for the purposes of LBR 2017-1(b)(1), and no authority for the proposition that failure
19  to appear under LBR 2017-1(b)(1) precludes contempt against those who are "in active concert or
20  participation" with those bound by the TRO.

21      Lichtenegger also argues that he withdrew from any "potential associations" with Salyer
22  or CVS that would be relevant to the Drum Line prior to issuance of the TRO on August 24th.
23  He argues any facts linking him with CVS after August 21, when he first learned of the
24  possibility of a TRO, "are so attenuated that it will be impossible for the court to find by clear and
25  convincing evidence that Appellant *acted on behalf of* CVS in any capacity."  (ECF No. 18 at 12.)
26  However, as stated above, Lichtenegger does not dispute that he actively communicated with
27  Salyer and Rose about the Drum Line on August 21; that Salyer continued to send emails to
28  Lichtenegger on August 23 stating clearly that the Drum Line had not yet shipped; and that Rose

called him several times in the days following entry of the TRO.  Lichtenegger also does not

credibly dispute that he did, in fact, know that the Drum Line had not shipped at the time the TRO

was entered, and that he could have taken steps toward compliance with the TRO.

For the foregoing reasons, the Court finds there is no genuine issue of material fact

regarding whether Lichtenegger was bound by the TRO, by virtue either of his status as counsel

for CVS or by acting in active concert or participation with Rose and Salyer.

### C.      Actual Notice of the TRO

For an injunction to be enforceable, Federal Rule of Civil Procedure ("FRCP") 65(d)(2),

incorporated by Federal Rule of Bankruptcy Procedure ("FRBP") 7065, requires that parties have

"actual notice by personal service or otherwise."  FRBP 7005 incorporates FRCP 5, which states

in part that service is complete upon mailing the papers to the person's last known address.  Fed.

R. Civ. P. 5(b)(2)(C).  The sufficiency of notice is a matter within the trial court's discretion.

*United States v. State of Ala.*, 791 F.2d 1450, 1458 (11th Cir. 1986) (quoting *Corrigan Dispatch*

*Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 302 (5th Cir. 1978)).

Rose argues that he is excused from compliance with the TRO because he did not have

actual notice until August 31 when he returned from vacation — after the Drum Line had already

left the country.[3]  (ECF No. 5 at 21–22).  However, the record indicates that Rose did receive

actual notice of the TRO.  On August 21, 2009 — before Rose went on vacation, three days

before the TRO hearing, and upon request by Appellants — the Trustee sent Rose the moving

papers for the TRO by email.  (*See* Carlson Declaration, ECF No. 8-14 at 5–6.)  After the hearing

on August 24th, the Trustee mailed the TRO papers to Appellants' respective offices, thereby

fulfilling the service requirements of the TRO.  (ECF No. 8-14 at 5–8.)  On August 25, 2009, the

Trustee sent a letter detailing the requirements of the TRO by "email, fax, and Federal Express"

to both Rose and Lichtenegger.  (*See* Fax to Rose and Lichtenegger, ECF No. 8-4 at 24.)  Rose

claims that he did not review any of the mail, emails or faxes related to the Drum Line.  (ECF No.

5 at 8).  However, even if this were the case, Rose called Lichtenegger several times following

---

[3] The Court declines to reach Rose's other arguments regarding notice — that he did not have sufficient notice for an *ex parte* hearing (ECF No. 5 at 20), and that he "cannot be faulted" for not appearing at the TRO hearing (ECF No. 5 at 19) — because it is unnecessary to decide them in order to render judgment.

entry of the TRO on August 24.  On August 28, Rose had a 15 minute phone call with

Lichtenegger — three days before the shipment of the Drum Line and four days after the issuance

of the TRO.  (ECF No. 9-13 at 10–11; ECF No. 8-13 at 32.)  Rose claims in his affidavit that

during that call they were unable to "speak or hold a normal conversation," and that he did not

discuss the TRO with Lichtenegger or others involved with the TRO issue while on vacation.

(*See* Rose Declaration, ECF No. 9-4 at 6, 12–13; ECF No. 5 at 18–19, 21).  The bankruptcy court

found — and the Court agrees — that it is highly doubtful that two people would either continue

a phone call for fifteen minutes with neither able to communicate, or, that two counsel who

clearly were aware that a TRO hearing had been scheduled for August 24th, and that compliance

with a TRO seeking to prevent shipment of the Drum Line was still possible, would have a fifteen

minute phone call and fail to mention that issue at some point during the conversation.  (*See* Rose

Call Records, ECF No. 8-15 at 34; ECF No. 9-13 at 10–11.)  Finally, it is not credibly disputed by

Rose that he knew a TRO hearing had been scheduled for August 24th, that the Trustee was

seeking to prevent the Drum Line from being shipped, and that he, Lichtenegger, and Salyer had

discussed the Drum Line and the possibility of a TRO prior to the August 24th hearing.  In sum,

there is overwhelming evidence that Rose had actual notice of the TRO before the Drum Line

was shipped to New Zealand on August 31st.

Lichtenegger appears to acknowledge that he received actual notice of the TRO by August

25th because "[s]tarting Monday afternoon and continuing through to Wednesday, [he] received

e-mails and packages from Mr. Carlson.  [H]e also received a fax in which Carlson threatened

him with sanctions if [he] did not do anything."  (*See* Lichtenegger Declaration, ECF No. 8-13 at

32.)  Lichtenegger also specifically stated at his deposition that he received a fax from the Trustee

on August 25th requesting compliance with the TRO, but Lichtenegger deliberately stopped his

fax machine before the entire fax could be printed because he did not want to be involved.  (*See*

Lichtenegger Deposition, ECF No. 8-13 at 48, 50.)  There is no authority for Lichtenegger's

attempt to defeat the actual notice requirement in this purposefully evasive way.  As with Rose,

the evidence indicates overwhelmingly that Lichtenegger had actual notice of the TRO before the

Drum Line was shipped to New Zealand on August 31st.

1    For the foregoing reasons, the Court also finds that there is no genuine issue of material

2    fact regarding whether Lichtenegger or Rose had actual notice of the TRO.

3                        **D.  Violation of the TRO**

4    This Court now looks to whether Appellants failed to comply with the terms of the TRO.

5    The TRO required the parties to: (1) refrain from "selling, transferring, encumbering, or moving

6    the Drum Line out of California;" and (2) produce a corporate designee with information on the

7    Drum Line, specifically its "location, storage and condition," and any plans to "sell, transfer or

8    move" it.  (ECF No. 8-4 at 11–13; ECF No. 8-16 at 50.)

9    Parties may be found in civil contempt for disobeying a specific and definite court order

10   by failing to take all reasonable steps within the party's power to comply.  *Inst. of Cetacean*

11   *Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014).  Substantial

12   compliance may be a defense to civil contempt if the party has made all reasonable efforts to

13   comply with the court order. *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir.

14   1986) (citing *Vertex Distributing v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 891–92 (9th Cir.

15   1982)).  However, "[t]here is no basis in law for a good faith exception to the requirement of

16   obedience to a court order."  *Inst. of Cetacean*, 774 F.3d at 955 (quoting *In re Crystal Palace*

17   *Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987)) (internal quotations omitted).[4]

18                    **1.      Violation of the Transfer Requirement**

19   Rose argues that he did not facilitate the movement of the Drum Line (ECF No. 5 at 13),

20   and that he did not know that the Drum Line had not already shipped (i.e., that compliance was

21   possible) (ECF No. 5 at 17, 20).  Rose relies on the fact that Segal, another attorney associated

22   with Salyer, told him on August 21 that the Drum Line had already shipped.  (ECF No. 5 at 17.)

23   However, basic investigation by Rose would have revealed Segal's statement to be false.

24   _____

25   [4] The Court notes Lichtenegger's arguments regarding the bankruptcy court's finding that the TRO was a prohibitory injunction rather than a mandatory injunction.  (ECF No. 9-13 at 19.)  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009) (internal citations and alterations omitted) ("A prohibitory injunction prohibits a party from taking action and preserve[s] the status quo pending a determination of the action on the merits …  A mandatory injunction orders a responsible party to take action … A mandatory injunction goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored.")  Regardless of which characterization the TRO receives, it was justified, it was clear in its terms, and Lichtenegger and Rose did not comply with the TRO.

1   Lichtenegger was able to easily learn from Salyer that the Drum Line had not in fact shipped.

2   (ECF No. 8-15 at 50–51.)  Rose conferred with Salyer on or after August 31, 2009, upon Rose's

3   return from vacation.  (ECF No. 8-16 at 43.)  At a minimum, the facts indicate that Rose had

4   access to Salyer and could have made an inquiry into the status of the Drum Line as Lichtenegger

5   did.  The far more creditable account regarding Rose's knowledge of the Drum Line during the

6   period the TRO was in effect was that Rose knew the Trustee was seeking an injunction; he

7   discussed the TRO with Lichtenegger; and Rose's actions show a purposeful evasion of the TRO

8   rather than compliance.

9           Lichtenegger argues that he did not make a misrepresentation regarding the status of the

10  shipment to the Trustee (ECF No. 6 at 11); complied with the TRO by informing Salyer of its

11  requirements and consequences of non-compliance (ECF No. 6 at 16); and that it was not possible

12  for him to comply with the orders (ECF No. 6 at 20).  However, by August 23, Lichtenegger

13  knew that the Drum Line had not yet shipped.  Despite this knowledge, Lichtenegger made no

14  attempts to correct the false information he provided two days earlier to Carlson.  As noted,

15  Lichtenegger stated he received a fax from the Trustee on August 25 requesting compliance, but

16  Lichtenegger deliberately stopped his fax machine before the entire fax could be printed because

17  he did not want to be involved with the TRO.  (ECF No. 8-13 at 48, 50.)  Lichtenegger argues

18  that he took reasonable steps to comply by discussing the TRO with Salyer and advising Salyer of

19  his need to comply.[5]  (ECF No. 6 at 16).  However, the bankruptcy court noted that if

20  Lichtenegger had appeared on Monday at the TRO hearing and informed the Trustee that the

21  Drum Line had not shipped, the court could have issued an immediate order to prevent it from

22  leaving the port.  (ECF No. 9-13 at 19.)  At no point during the time the Drum Line remained in

23

24  [5] Lichtenegger first asserted these facts in an affidavit in opposition to summary judgment.  (ECF No. 9-8 at 3.)
    Affidavits that are raised only in opposition to a motion for summary judgment may be disregarded if they contradict

25  earlier statements made by the parties, and are intended only to create an issue of fact in order to defeat summary
    judgment.  *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991).  In order to disregard the affidavit,
    the court must make a factual determination that it is a "sham," and the inconsistencies must be clear and

26  unambiguous.  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 999 (9th Cir. 2009).  The sham affidavit rule should be
    applied with caution.  *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993).

27  The record supports Lichtenegger's assertion that he attempted to disclose something during deposition but was
    prevented by counsel.  That the disclosure involved Salyer is not an unreasonable inference.  (See Lichtenegger

28  Deposition, ECF No. 9-8 at 3.)  Therefore, the Court takes Lichtenegger's affidavit into consideration.

1  port – when in all likelihood it could have been prevented from departing – did Lichtenegger take

2  any steps to correct his previous statements to Carlson that the Drum Line had already shipped.

3      The Court notes:  "One need not commit an unlawful act in order to be liable for

4  conspiring to evade a judgment of a court: it is contempt to act solely for the purpose of evading a

5  judgment. [citations]  Moreover, any party who knowingly aids, abets, or conspires with another

6  to evade an injunction or order of a court is also in contempt of that court."  *N.L.R.B. v. Laborers'*

7  *Int'l Union of N. Am., AFL-CIO*, 882 F.2d 949, 954 (5th Cir. 1989).  This Court wholeheartedly

8  agrees with the bankruptcy court that the more creditable account regarding Rose and

9  Lichtenegger's actions during the course of the TRO was that each took no actions to comply

10  with the transfer provision in the TRO, and instead purposefully evaded it, therefore violating the

11  transfer requirement.

12      **2.      Violation of the Corporate Designee Requirement**

13      Even if there were adequate factual ambiguity to withstand summary judgment on the

14  violation of the transfer requirement in the TRO, there is no such ambiguity that Appellants did

15  not produce a corporate designee with knowledge of the Drum Line's whereabouts, either by the

16  August 29, 2009 date stated in the TRO, or the September 11, 2009 date stated in the preliminary

17  injunction.

18      As noted above, the Court finds that both Rose and Lichtenegger were bound by the

19  requirements to produce a corporate designee.  It is undisputed that both Rose and Lichtenegger

20  failed to produce a corporate designee by August 29.  However, Rose argues that he complied

21  with the preliminary injunction because by September 10, 2009, he produced Mr. Gallardo, a

22  worker employed by the entity owning CVS who managed the pre-shipment handling of the

23  Drum Line.  (ECF No. 5 at 24.)  Appellee responds that although Mr. Gallardo prepared the Drum

24  Line for shipment, he was a low level employee with no information regarding the "location,

25  storage and condition" of the Drum Line, nor of any plans to "sell, transfer or move" the Drum

26  Line.  (ECF No. 15 at 16, 20.)  Mr. Gallardo's deposition divulged another witness, Ms. Kinder,

27  who was also deposed but who Appellee states had no material knowledge of the status of the

28  Drum Line.  (ECF No. 15 at 17.)  Rose provides no adequate response to the fact that the

1    witnesses he produced lacked adequate knowledge of the Drum Line's whereabouts.  Rose's

2    attempts fall short of reasonable steps to comply with the TRO, especially considering the fact

3    that  the entire time Rose knew of a corporate designee with actual knowledge of the Drum Line

4    shipment: Salyer.  Salyer sent Lichtenegger and Rose an email on August 31, 2009, stating that

5    the Drum Line was headed to New Zealand.  (*See* ECF No. 9-1 at 7.)  In his deposition, Rose

6    states that he discussed the Drum Line directly with Salyer on or after August 31, 2009.  (ECF

7    No. 8-16 at 43.)  Rose also attempted to get information regarding the Drum Line shipment from

8    Salyer's counsel, Segal and Mr. Putterman.  (ECF No. 8-16 at 42.)  However, at the September 3,

9    2009, hearing for the preliminary injunction, Rose told the court that he was acting on his own

10   and had no knowledge of who arranged the shipment of the Drum Line.  (*See* Preliminary

11   Injunction Hearing, ECF No. 10-1 at 18–19.)  The Court finds that Rose did not comply with the

12   TRO or preliminary injunction regarding the production of a corporate designee.

13        On October 8, 2009, the bankruptcy court threatened Lichtenegger with sanctions if he did

14   not produce a corporate designee with the required knowledge of the Drum Line's status and

15   plans to move it.  (*See* Continued Preliminary Injunction Hearing, ECF No. 9-1 at 16)  During

16   said hearing, similar to Rose, Lichtenegger refused to produce Salyer, or tell the court from whom

17   he was taking directions.  (ECF No. 9-1 at 15.)  Prior to these hearings, another attorney for

18   Salyer directed Rose and Lichtenegger not to produce Salyer, nor to provide any facts regarding

19   the Drum Line shipment.  (ECF No. 9-1 at 7.)  Even if Rose and Lichtenegger could not produce

20   Salyer himself, Salyer could have directed them to Rick Emmett, who coordinated the movement

21   of the Drum Line under Salyer's direction.  (ECF No. 8-10 at 39.)  The Trustee's independent

22   investigation ultimately produced Rick Emmett.  (ECF No. 15 at 17.)  Rick Emmet's deposition

23   and document production revealed the details of the Drum Line shipment.  (ECF No. 15 at 18.)

24        In summary, there is no genuine dispute that both before and after the TRO was entered

25   Appellants knew of persons with knowledge regarding the Drum Line's status and whereabouts,

26   and Appellants did not identify or produce such persons within the times frames stated in the

27   TRO or the subsequent preliminary injunction.  The Court therefore finds that there is no genuine

28   issue of material fact regarding whether Appellants failed to comply with both the TRO and the

19

1  preliminary injunction's requirements to produce a corporate designee with knowledge of the

2  status and location of the Drum Line.

3             **E.**        **Damages**

4         Civil penalties must either be compensatory or designed to coerce compliance.  *In re*

5  *Dyer*, 322 F.3d 1178, 1192 (9th Cir. 2003) (citing *F.J. Hanshaw Enters., Inc. v. Emerald River*

6  *Dev., Inc.*, 244 F.3d 1128, 1137–38 (9th Cir. 2001)).  Damages for civil contempt awards must be

7  proven by a preponderance of the evidence.  *Ahearn ex rel. N.L.R.B. v. Int'l Longshore &*

8  *Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1130 (9th Cir. 2013).  The fact-finder may

9  make a "just and reasonable estimate" of damages based on inferential and direct proof.  *Zenith*

10  *Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969) ("It would be an inducement

11  to make wrongdoing so effective and complete in every case as to preclude any recovery, by

12  rendering the measure of damages uncertain").  Here, the bankruptcy court awarded $350,000

13  "based on the price CVS agreed to pay to SK Foods when CVS purchased the Drum Line in

14  December of 2008."  (ECF No. 9-13 at 19.)

15         Rose argues that "by the time the Drum Line was shipped out of Oakland it had been left

16  outside, vandalized, and then broken down into pieces."  (ECF No. 5 at 25.)  Lichtenegger argues

17  that the amount of damages could have been $133,930, the value fixed by the insurance company

18  in the course of shipment, and also that the Drum Line could have been shipped back from New

19  Zealand.  However, neither Rose nor Lichtenegger provide an adequate response to the

20  bankruptcy court's finding that $350,000 was the price CVS agreed to pay to SK Foods when

21  CVS purchased the Drum Line in 2008.  The Court notes that the Drum Line manufacturer K-

22  Pack International, Ltd. stated that the value of the Drum Line would be $1.5 million after

23  $400,000 in repairs were made, which at minimum renders neutral Appellants' arguments that the

24  Drum Line had little value.  (*See* email from Ken Gifford, Managing Director of K-Pack, ECF

25  No. 8-15 at 21–26.)  Appellants also do not provide evidence that they, Salyer, or any other

26  relevant person – those who had knowledge of the Drum Line's whereabouts, unlike the Trustee –

27  tried in any meaningful way to facilitate the Drum Line's return during the course of the Trustee's

28  investigation after the TRO and preliminary injunction were entered.  Therefore, the Court agrees

with the bankruptcy court in finding that $350,000 is an appropriate value for contempt sanctions.

## V.   <u>CONCLUSION</u>

For the reasons set forth above, the Court hereby AFFIRMS the judgment of the bankruptcy court (ECF No. 9-15 at 1–2; Bankruptcy Adversary Proceeding Case No. 09-02543, ECF No. 671 at 1–2) against Appellants Gerard Rose and Larry Lichtenegger.

Dated:  August 11, 2015

Troy L. Nunley
United States District Judge